UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DIRECT MAIL OF MAINE, INC.,

                              Plaintiff,

                                                        Case # 6:22-CV-6570-FPG

v.

                                                        DECISION AND ORDER

CONDUENT BUSINESS SERVICES, LLC,

                              Defendant.

## INTRODUCTION

On December 22, 2022, Direct Mail of Maine, Inc. ("Plaintiff" or "DMM") brought this action against Conduent Business Services, LLC ("Defendant" or "Conduent") asserting claims for breach of contract, breach of an implied covenant of good faith and fair dealing, unjust enrichment, and fraudulent inducement. *See* ECF No. 1 at 20-30. This action arises out of Plaintiff's lease and operation of an industrial printing facility at which it performed printing and direct marketing services for Defendant's third-party clients. *Id.* The Court has jurisdiction over this action under 28 U.S.C. § 1332. *Id.* at 2.

On April 7, 2023, Defendant moved to dismiss Plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6). *See* ECF No. 18. Plaintiff responded in opposition, ECF No. 22, and Defendant replied. ECF No. 23. For the reasons set forth below, Defendant's motion to dismiss is denied.

## BACKGROUND

Courts evaluating a motion to dismiss must accept facts alleged in the complaint as true and draw all reasonable inferences from those facts in favor of the non-moving party. *Nat'l Fed.*

*of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 567 (D. Vt. 2015).  While courts generally may not look beyond the pleadings when reviewing a motion to dismiss, Fed. R. Civ. P. 10(c) authorizes courts to consider any exhibits attached to the pleadings.  *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *Goldman v. Belden*, 754 F.2d 1059, 1065-66 (2d Cir. 1985).  Plaintiff has attached exhibits to its complaint, which are accordingly treated as part of Plaintiff's pleadings for the purposes of this motion.  ECF Nos. 1-1, 1-2, 1-3, 1-4.  The facts below are taken from Plaintiff's complaint and its attached exhibits, unless otherwise stated.[1]

### A.  The Parties

Plaintiff is a Maine corporation, with a principal place of business in Scarborough, Maine, that provides direct marketing and document output solutions, including "printing, direct mail production, and related communications services, to a number of industries, including financial, healthcare, insurance, and retail businesses."  ECF No. 1 at 2-3.  Defendant is a Delaware limited liability company, with a principal place of business in Florham Park, New Jersey.  ECF No. 1 at 2, 3.  Defendant, formerly a subsidiary of Xerox Corporation ("Xerox") that was known as Xerox Business Services, LLC ("XBS") until 2016, is a business services provider that performs printing and communications services.  *Id*.

### B.  The Master Services Agreement, North Wales Facility, and 2014 Transaction

On February 15, 2010, Plaintiff and Xerox executed a Master Services Agreement (the "MSA"), under which Plaintiff would provide printing and related production services to Xerox.  *Id*. at 4; ECF No. 1-1.  On September 16, 2013, a Second Amendment to the MSA added XBS as a party to the MSA.  ECF No. 1 at 4.

---

[1] This factual background is intended as a summary only and does not necessarily include every factual allegation material to Plaintiff's claims.  Additional detail is provided in the Court's analysis, as needed, below.

On March 27, 2014, Plaintiff and XBS executed a Third Amendment to the MSA, ECF No. 1-1 at 32, under which Xerox assigned its lease of an industrial printing facility in North Wales, Pennsylvania (the "North Wales Facility") to Plaintiff.  *Id*. at 4.  The Third Amendment followed a series of transactions (the "2014 Transaction") between the parties that effectuated Plaintiff's "take over" and operation of the North Wales Facility and the printing services Xerox had performed there since 1999.  *Id*.  The 2014 Transaction also included Plaintiff's sublease of a portion of the space available in the North Wales Facility back to Defendant (the "Sublease"). *Id*. at 5; ECF No. 1-2.  The Sublease, extended in 2017 through March 31, 2020, allowed Defendant to service and maintain relationships with certain third-party clients of Defendant, including a client known as "Life Celebrations."  *Id*.

Plaintiff's operation and "take over" of the North Wales Facility was a "major financial undertaking and significant expansion" for Plaintiff's business.  *Id*.  Before the 2014 Transaction, Plaintiff's only printing facility was located in Scarborough, Maine.  *Id*.  Plaintiff alleges that it "needed to maintain certain workload and revenue levels" for the 2014 Transaction and its operation of the North Wales Facility to be and remain financially viable.  *Id*.

As part of the 2014 Transaction, Defendant subcontracted to Plaintiff the printing services that Defendant had performed under a number of then-existing contracts with third party clients (the "Existing Contracts"), which included at least two contracts with Bank of America ("BOA"): the (i) BOA Lockbox contract and (ii) BOA Claims contract.  ECF No. 1 at 6-7. Plaintiff alleges that the subcontracting work it performed in connection with the Existing Contracts was important to its ability to maintain the revenue required to sustain its operation of the North Wales Facility.  *Id*. at 5.  With respect to the Existing Contracts, the Third Amendment to the MSA stated that Defendant must use "reasonable commercial efforts to extend the term of

the Existing Contracts" and that, while the MSA and its Amendments were in effect, Plaintiff "shall be the exclusive provider to Xerox of the services to be performed under the Existing Contracts, and … Xerox shall not perform any such services itself or through an affiliate or through a third party." *Id*. at 7.

In 2016, the parties executed a Fifth Amendment[2] to the MSA, ECF No. 1-1 at 79, after Defendant terminated several of Plaintiff's subcontracts that related to certain of the Existing Contracts. *Id*. The Fifth Amendment, in pertinent part, amended Section 8 of the Third Amendment to provide that if a client of Defendant, pursuant to any Existing Contract, "requested that the work done pursuant to that contract be transferred from [Plaintiff] to another vendor, [Defendant] would use 'reasonable best efforts' to provide written confirmation of the request from the client to [Plaintiff]." *Id*. at 7. In late 2016, Xerox "spun off" XBS into a separate company, Conduent, which "assumed XBS's rights and obligations under" the MSA, its amendments, and all relevant contracts in this matter. *Id*. at 3-4.

**C. PCR 17 and 18**

After the 2014 Transaction, the parties executed at least eighteen additional subcontracts and modifications of the Existing Contracts called Project Change Requests ("PCRs"). *Id*. at 7-8. In early 2020, the parties executed PCR 17, ECF No. 1-3, to address declining business volume and revenue at the North Wales Facility, a decline which Plaintiff contends jeopardized its ability to continue operating the facility for the duration of the lease. *Id*. at 9-10. PCR 17 provided that Plaintiff would perform color print services at the North Wales Facility for Defendant's third-party client "HCA" from May 2020 until March 31, 2022. *Id*. at 10. PCR 17 further provided that the HCA work would be performed at "the rate card pricing established

---

[2] The Fourth Amendment, executed on April 3, 2014, corrected a clerical error within the Third Amendment and is immaterial to this dispute. ECF No. 1-1 at 78.

between [Plaintiff and Defendant][,]" which reflected Plaintiff's then-standard rates under the MSA.  *Id*. at 11.  Plaintiff alleges that Defendant subcontracted the HCA work to Plaintiff in PCR 17 to "induce [Plaintiff] to continue operating the North Wales Facility and extend the North Wales sublease."  *Id*. at 12.  On July 21, 2020, Defendant informed Plaintiff that it was transferring the HCA work from the North Wales Facility to a different, Defendant-operated facility in Lynnfield, Massachusetts (the "Lynnfield Facility") that offered lowered rates, on the basis that HCA had requested a cost reduction.  *Id*. at 12-13.

On December 6, 2020, the parties executed PCR 18, ECF No 1-4, to address work Plaintiff performed for Defendant's third-party clients Life Celebrations and BOA Lockbox.  *Id*. at 14-16.  Throughout 2020, Plaintiff alleges that it informed Defendant that Plaintiff "would not be able to continue operating the North Wales Facility," due to declining revenue, even with the addition of the HCA work that was contemplated by PCR 17.  *Id*. at 14.  PCR 18 provided that Plaintiff would perform print services for Life Celebrations and BOA Lockbox in exchange for monthly fees from Defendant, and that Plaintiff would lease the North Wales Facility until March 31, 2022.  *Id*. at 16.

In May 2021, Defendant notified Plaintiff that its subcontract for BOA Lockbox work was to be terminated effective July 28, 2021.  *Id*. at 17-18.  In July 2021, Defendant notified Plaintiff that the Life Celebrations subcontract was to be terminated effective July 31, 2021.  *Id*.

**D.  BOA Claims**

On March 27, 2014, per the Third Amendment to the MSA, Xerox subcontracted Plaintiff to perform services under certain Existing Contracts with BOA, which Plaintiff contends included a contract with "BOA Claims."  *Id*. at 18.  Section 8 of the Third Amendment stated that Plaintiff would be the "exclusive provider to Xerox of the services to be performed under the

Existing Contracts[,]" and that "Xerox shall not perform any such services itself or through an affiliate or through a third party." *Id*.  In April 2019, Defendant transferred the BOA Claims work from Plaintiff and the North Wales Facility to the Lynnfield Facility. *Id*. at 19.  Plaintiff contends that this transfer was not directly requested by BOA, but "performed unilaterally" by Defendant to increase Defendant's profit margin. *Id*.

### E.  Complaint

On December 22, 2022, Plaintiff brought the present action, asserting ten claims.  ECF No. 1 at 1.  With respect to PCR 17 and Defendant's transfer of the HCA work, Plaintiff asserts claims for (i) breach of contract; (ii) unjust enrichment; and (iii) fraudulent inducement.  With respect to PCR 17 and the requested rate reduction, specifically, Plaintiff asserts a claim for (iv) fraudulent inducement.  Plaintiff further asserts claims for (v) breach of contract with respect to the parties' agreement for Plaintiff to continue operating the North Wales Facility; (vi) fraudulent inducement with respect to PCR 18 and the Life Celebrations and BOA Lockbox work; (vii) breach of implied covenant of good faith and fair dealing with respect to PCRs 17 and 18; (viii) breach of contract with respect to the Third Amendment of the MSA and the BOA Claims work; (ix) breach of implied covenant of good faith and fair dealing with respect to the Third Amendment of the MSA and the BOA Claims work; and (x) unjust enrichment with respect to the BOA Claims work. *Id*. at 20-31.

### LEGAL STANDARD

To survive a Rule 12(b)(6) challenge, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted). A district court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

The "touchstone for a well-pleaded complaint under Federal Rules of Civil Procedure 8(a) and 12(b)(6) is plausibility." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 670 (S.D.N.Y. 2007) (citing *Twombly*, 550 U.S. at 560-61). To meet this plausibility standard, the factual allegations must permit the Court "to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. 679.

At the motion to dismiss stage, a court need not accept the allegations of the complaint regarding the construction of the [contract], but instead can interpret the contract before it. *Gerdau Ameristeel US Inc. v. Ameron Int'l Corp.*, No. 13 Civ. 07169 (LGS), 2014 WL 3639176, at *3 (S.D.N.Y. July 22, 2014). "[A] district court may dismiss a breach of contract claim" on a Rule 12(b)(6) motion "only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016). The Court now turns to Defendant's motion.

## DISCUSSION

## I. Breach of Contract (Counts I, V, and VIII)

### A. PCR 17 (Count I)

Plaintiff alleges in Count I that Defendant breached PCR 17 when it terminated Plaintiff's subcontract with HCA and transferred the HCA work from the North Wales Facility to the Lynnfield Facility. ECF No. 1 at 20. Plaintiff argues that Defendant agreed that Plaintiff would perform all HCA work until March 2022 because PCR 17 was a "requirements contract"

that provided for exclusive dealing between the parties.  *Id*; ECF No. 22 at 12.  Defendant argues that PCR 17 was "not a requirements contract and thus did not obligate [Defendant] to send HCA Work to [Plaintiff]."  ECF No. 18-1 at 12.  For the reasons below, Count I may proceed.

Under New York law, which the parties agree applies to this diversity action, "there are four elements to a breach of contract claim: (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (internal quotation marks omitted).  Only the third element is in dispute.

As discussed, "[a]t the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous."  *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016).  "Whether a contract is ambiguous is a question of law for the court to decide."  *Bayerische Landesbank, N.Y. Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012).  "Ambiguous" contract language is that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Eskimo Pie Corp. v. Whitelawn Dairies, Inc.*, 284 F. Supp. 987, 994 (S.D.N.Y. 1968); *see also Walk–In Medical Centers, Inc. v. Breuer Capital Corp.*, 818 F.2d 260, 263 (2d Cir.1987).  Conversely, contract language is not ambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the (contract) itself, and concerning which there is no reasonable basis for a difference in opinion."  *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978); s*ee also Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).

"A 'requirements contract' is a contract which calls for one party to furnish materials or goods to another party the extent of the latter's requirements in business." *Pulaski Materials Co. v. Milestone Materials, Inc*., 35 F. Supp. 2d 279, 286 (W.D.N.Y. 1998) (citing *Cyril Bath Co. v. Winters Industries*, 892 F.2d 465, 467 (6th Cir. 1989)); *see also R.A. Weaver & Assocs., Inc. v. Asphalt Constr., Inc*., 587 F.2d 1315 (D.C. Cir. 1978). N.Y.U.C.C. § 2–306(1) sets forth the standard for a requirements contract as follows:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

New York courts hold that the essential terms of a valid requirements contract include "price, identity of the goods sold, minimum quantity, delivery, and time and method of payment[,]" *Lorbrook Corp. v. G & T Indus., Inc*., 162 A.D.2d 69, 72 (1990), while others conclude that "the absence of a precise quantity term" may not prevent enforcement of a "requirements contract" because such a term "may not be essential[,]" though this caveat applies to contracts wherein a party agrees in generalized terms to furnish or produce the entirety of or "all" goods or services that another requires. *Goaltex Corp. v. Ass'n for Blind & Visually Impaired*, 979 N.Y.S. 2d 481, 487 (Sup. Ct. 2014) (citing *Feld v. Henry S. Levy & Sons, Inc*., 37 N.Y.2d 466, 468 (1975) (enforceable "requirements" or "output" contract where agreement was to sell "all" goods).

Defendant contends that Plaintiff's claim for breach of PCR 17 should be dismissed because it was not a binding "requirements contract" on the basis that it lacked a "minimum quantity" term, while Plaintiff maintains that PCR 17 did amount to a requirements contract because it provided that Plaintiff would perform "all" the HCA work.  ECF No. 18-1 at 12; ECF

No. 22 at 12.  In the alternative, Plaintiff contends that PCR 17 contains a minimum quantity term.  ECF No. 22 at 12.  The Court must examine the terms of PCR 17.

PCR 17, described within as "HROS HCA Qrtly [sic] Color Work," states that "DMM will process HROS HCA color work at the rate card pricing established between DMM and Conduent."  ECF No. 1-3.  The contract then provides rates for the products and services to be performed at the North Wales Facility, such as "color image 8.5x11," "auto insertion 6x9," "additional inserts," "WOW metering," and "manual insertion."  *Id*. at 1.  The PCR further provides that the pricing changes were "Per file charge; varies with volume."  *Id*. at 2.  This is the extent of the relevant terms.

Plaintiff first contends that Defendant's reliance upon the purported absence of a "minimum quantity" term is inapposite because PCR 17 reflects the parties' agreement that Plaintiff would perform "all" the HCA work at the North Wales Facility, which, as explained above, is a valid basis for the creation of a "requirements contract."  *Goaltex Corp*., 979 N.Y.S. 2d at 487.  The relevant language that may conceivably support such a contention in PCR 17 is its term that "DMM *will process HROS HCA color work* at [pricing rates]."  ECF No. 1-3 (emphasis added).  Plaintiff argues that this general provision is ambiguous in that it implies that DMM would process "all" of the HROS HCA color work, even if this is not explicitly stated. While Plaintiff's proffered interpretation of the provision is generous, the Court cannot conclude, at the motion to dismiss stage, that the provision is not "capable of more than one meaning when viewed objectively by a reasonably intelligent person," despite its lack of the word "all." *Eskimo Pie Corp*., 284 F. Supp. 987, 994 (S.D.N.Y. 1968); *see also Walk–In Medical Centers, Inc*., 818 F.2d at 263.  While PCR 17 does not directly state that Plaintiff would provide all or the entirety of the HCA work, the Court cannot conclude that "there is no reasonable basis for a difference in

opinion" as to whether the challenged language implies that meaning.  *Breed*, 46 N.Y.2d at 355;

*see also Hunt Ltd. v. Lifschultz Fast Freight, Inc*., 889 F.2d 1274, 1277 (2d Cir. 1989).

However, the Court concludes that PCR 17 is not ambiguous as to whether it includes a

"minimum quantity" term.  Again, PCR 17 provided that Plaintiff would perform the "HROS

HCA Qrtrly Work" and that the pricing changes were "Per file charge; varies with volume."

ECF No. 1-3 at 2.  Plaintiff contends that this language suggests a minimum volume of at least

"one unit per quarter" of the HCA work.  ECF No. 22 at 13.  Defendant contends that such

language cannot reasonably be read to suggest such a minimum quantity because it means only

that "the amount Conduent paid DMM depended on the quantity of work Conduent ordered, if

any."  ECF No. 18-1 at 12.  In addition, Defendant points out Plaintiff's allegation in its own

complaint that "not a single PCR contained a volume minimum[,]" ECF No. 1 at 8, an omission

that Plaintiff alleges the parties agreed to in order to enable more flexible and efficient

performance of the subcontracts.  *Id*.  As discussed, while the Court need not accept as true

allegations in a complaint with respect to the construction of a contract, the Court finds that this

inconsistency between Plaintiff's proffered interpretation of the challenged language and

Plaintiff's complaint bolsters Defendant's contention that the language cannot reasonably be read

to imply a "minimum quantity" term.  In addition, contrary to Plaintiff's argument, the provision

"varies with volume" suggests that PCR 17 does not contain a minimum quantity; rather, it

suggests that the volume of work to be performed may not amount to any defined quantity, let

alone a minimum.  Indeed, "vary" means "to exhibit or undergo change."  *Merriam-Webster.com*

*Dictionary*,   s.v.   "vary,"   accessed   December   4,   2023,   https://www.merriam-

webster.com/dictionary/vary.  Accordingly, the Court concludes that PCR 17 is not ambiguous

as to whether it included a "minimum quantity" term such that it would render PCR 17 a "requirements contract" on that basis. This aspect of Plaintiff's argument is rejected.

Thus, the Court concludes that PCR 17 is ambiguous as to whether it is a "requirements contract" and therefore whether Defendant was bound to keep the HCA work at the North Wales Facility, such that Defendant's transfer of the HCA work may have amounted to a breach of PCR 17. Count I may proceed.

**B. Agreement to Operate the North Wales Facility (Count V)**

The contours of Count V are not immediately clear. Plaintiff alleges in Count V that in "early September 2020, DMM and Conduent agreed in writing to the material terms of a contract whereby Conduent would provide DMM with approximately an additional $500,000 in revenue by March 2022, and DMM would continue to operate the North Wales Facility and would not terminate the Prime Lease (the Third Amendment to the MSA)." ECF No. 1 at 24. Plaintiff alleges that Defendant breached this agreement by failing to pay Plaintiff "the agreed-upon monthly payments." *Id*. In its motion to dismiss, Defendant construed this allegation to state a claim for a breach of PCR 18, which provided that Defendant would pay monthly fees to Plaintiff for its work on the Life Celebrations and BOA Lockbox contracts, ECF No. 18-1, but Plaintiff then clarified in its opposition that its claim instead relates to a breach of an "August 2020 oral agreement 'whereby Conduent would provide DMM with approximately an additional $500,000 in revenue by March 2022, and DMM would continue to operate the North Wales Facility and would not terminate the Prime Lease." ECF No. 22 at 14. For the reasons below, Count V may proceed.

As discussed, under New York law, Plaintiff must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by

the defendant, and (4) damages." *Ellington Credit Fund, Ltd*, 837 F. Supp. 2d at 188-89.  Only the first element is in dispute.

With respect to the first element, Plaintiff's complaint alleges only that the parties executed a written agreement in September 2020, not an August 2020 oral agreement, as Plaintiff contends in its opposition.  ECF No. 1 at 24.  Still, the underlying allegations in Plaintiff's complaint suggest that Plaintiff intends to bring a claim for breach of an alleged August 2020 oral agreement.  In its complaint and opposition memorandum, Plaintiff asserts that this alleged oral agreement was merely "memorialized" by PCR 18, which was, according to Plaintiff, "just one of the means by which the parties implemented their [August 2020] oral agreement."  ECF No. 1 at 5; ECF No. 22 at 14.  Plaintiff maintains in its opposition that "Count V is not based on PCR 18."  ECF No. 22 at 14.  In addition, Count V is titled in the complaint as "Breach of Contract – Agreement to Continue Operating the North Wales Facility[,]" without reference to any PCR, unlike several other counts in the complaint, including Counts I-IV, VI-VII that do reference PCRs.  ECF No. 1 at 24.  "Draw[ing] all reasonable inferences in favor of the nonmoving party[,]" the Court thus construes Count V as asserting a breach of contract claim with respect to an alleged oral agreement, despite the inconsistency of Plaintiff's submissions. *Dow Chem. Co*., 517 F.3d at 115.

In the complaint, Plaintiff alleges that "[i]n August 2020, DMM's CEO told Ms. Visconti [Conduent Vice President] that, without additional annual revenue of $400,000 to $500,000, DMM would not renew the North Wales Sublease beyond March 31, 2021, and, in fact, DMM would terminate the Prime Lease and leave the North Wales Facility."  ECF No. 1 at 14-15. Plaintiff alleges that "[d]uring a phone call during the last week of August 2020, Ms. Visconti told DMM's CEO that she would find a way to provide DMM with the needed annual revenue."

*Id*. at 15.  "Specifically, during this phone call[,]" Plaintiff alleges, "the parties agreed to the essential terms of a contract whereby Conduent would make direct monthly payments to DMM" and, in exchange, "DMM would continue to operate the North Wales Facility and would not take action to terminate the Prime Lease or the North Wales Sublease."  *Id*.  Plaintiff contends that "[t]his agreement was eventually memorialized in PCR 18, which was executed on December 6, 2020."  *Id*. (emphasis added).  As discussed, Count V states the parties agreed "Conduent would provide DMM with approximately an additional $500,000 in revenue by March 2022, and DMM would continue to operate the North Wales Facility and would not terminate the Prime Lease (the Third Amendment to the MSA)."  ECF No. 1 at 24.

"A breach of contract claim 'that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal.'"  *DeMarle v. Videk, Inc*., No. 6:22-CV-06426 EAW, 2023 WL 4138880, at *6 (W.D.N.Y. June 20, 2023) (quoting *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009)).  "To show that an enforceable contract existed, the claimant must plead facts surrounding the formation of the contract such as the date the parties entered into the contract, the major terms of the contract, the parties to the contract, and that the party to be bound assented to the contract."  *Fuji Photo Film U.S.A., Inc*., 669 F. Supp. 2d at 412; *see Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008).

Here, Plaintiff properly alleges the existence of an enforceable agreement.  Plaintiff has alleged facts as to the date the parties entered into the contract (August 2020), the major terms of the contract (an additional $500,000 in revenue by March 2022, with monthly payments, and that DMM would continue to operate the North Wales Facility and not terminate the Prime Lease), the parties to the contract (DMM and Conduent), and that the party to be bound assented to the

contract (Visconti's oral assent during the alleged phone call).  ECF No. 1 at 14-15, 24.

Plaintiff's allegations, while sparse, are not the kind of "conclusory" allegations lacking in

"requisite specificity" that typically warrant dismissal.  *Berman*, 580 F. Supp. 2d at 202; *see also*

*Grayson v. Ressler & Ressler*, 271 F. Supp. 3d 501, 521 (S.D.N.Y. 2017) (dismissal appropriate

where plaintiff alleged, *inter alia*, that parties agreed to "work together").

    While Plaintiff has presented minimal factual allegations as to the existence of the

contract, the Court notes that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does

not need detailed factual allegations[,]" and the "[f]actual allegations [need only] be enough to

raise a right to relief above the speculative level…."  *Mayor & City Council of Baltimore, Md. v.

Citigroup, Inc*., 709 F.3d 129, 135 (2d Cir. 2013) (citing *Twombly*, 550 U.S. 544, 555 (2007)).

Here, Plaintiff's allegations pass muster.  Accordingly, Count V may proceed.[3]

## C.  BOA Claims (Count VIII)

    Plaintiff alleges in Count VIII that Defendant breached the Third and Fifth Amendments

to the MSA by terminating the BOA Claims work and transferring it from the North Wales

Facility to the Lynnfield Facility.  ECF No. 1 at 28.  Specifically, Plaintiff alleges that Defendant

failed to use reasonable commercial efforts to extend the term of the BOA Claims contract and

failed to provide Plaintiff with written notice of an alleged transfer request from BOA.  *Id*. at 28.

Defendant argues that no breach occurred because the BOA Claims work was not an "Existing

Contract" under either Amendment, and Defendant was therefore not bound to keep the work at

the North Wales Facility.  ECF No. 18.-1 at 13-14.  For the reasons below, Count VIII may

proceed.

---

[3] Defendant's contention that the alleged oral agreement is barred by New York's Statute of Frauds because its duration was longer than one year is unavailing because "[t]he fact that an alleged oral contract in fact lasted more than one year does not mean that it violated the Statute of Frauds, so long as nothing in its terms barred performance within a year."  *GB Marketing USA Inc. v. Gerolsteiner Brunnen GmbH & Co*., 782 F.Supp. 763, 777 (W.D.N.Y. 1991) (citing cases); *see Haughton v. Cognisight, LLC*, 953 F. Supp. 2d 478, 483 (W.D.N.Y. 2013).

As discussed, in 2014, Defendant subcontracted to Plaintiff the printing services that Defendant had performed "under a number of then-existing contracts with third party clients (the "Existing Contracts").  ECF No. 1 at 6-7.  With respect to the Existing Contracts, the Third Amendment to the MSA stated that Defendant must use "reasonable commercial efforts to extend the term of the Existing Contracts" and that, while the MSA and its Amendments were in effect, Plaintiff "shall be the exclusive provider to Xerox of the services to be performed under the Existing Contracts, and … Xerox shall not perform any such services itself or through an affiliate or through a third party." *Id*. at 7.  The Existing Contracts were listed on Schedule 5.1 to the MSA and included a contract titled "Bank of America" with an expiration date of March 1, 2016.  ECF No. 1-1 at 51.

The Fifth Amendment to the MSA, ECF No. 1-1 at 79, executed in 2016, amended Section 8 of the Third Amendment to provide that if a client of Defendant, pursuant to any Existing Contract, "requested that the work done pursuant to that contract be transferred from [Plaintiff] to another vendor, [Defendant] would use 'reasonable best efforts' to provide written confirmation of the request from the client to [Plaintiff]." *Id*. at 7.

First, Defendant contends the "BOA Claims" contract was not the Bank of America contract contemplated by Schedule 5.1, nor was it an Existing Contract in general.  ECF No. 18-1 at 13-14.  Second, Defendant contends that even if the BOA Claims contract was initially an Existing Contract, it ceased to be an Existing Contract and became a "Future Contract" that was not subject to the Third or Fifth Amendments to the MSA after it was extended past March 1, 2016.  ECF No. 18-1 at 14-15.  The Court addresses these arguments in turn.

Because Schedule 5.1 is ambiguous as to whether the "Bank of America" Existing Contract was or included the BOA Claims contract, Count VIII survives dismissal on the first

basis Defendant asserts.  Plaintiff correctly points out that Schedule 5.1 uses "broad entity names" to identify the relevant contracts and does not use specific contract identification numbers such that the BOA Claims contract may be readily ascertainable from the face of Schedule 5.1.  ECF No. 22 at 14-15.  Accordingly, the Court cannot conclude that "there is no reasonable basis for a difference in opinion" as to whether the challenged language in Schedule 5.1 encompasses the BOA Claims contract, and Defendant offers no persuasive allegations of their own to refute this.  *Breed*, 46 N.Y.2d at 355.

Defendant's second argument is likewise unavailing.  Defendant contends that even if the BOA Claims contract was initially an Existing Contract, it ceased to be one because it was extended past March 2016,[4] such that it would not be subject to the relevant Amendments. "Draw[ing] all reasonable inferences in favor of the nonmoving party[,]" the Court finds it plausible that an extended or renewed Existing Contract may have remained an Existing Contract for the purposes of the Third and Fifth Amendments to the MSA.  *Dow Chem. Co.*, 517 F.3d at 115.  The language of the Third Amendment suggests this because it provides without qualification that Defendant must use "reasonable commercial efforts to extend the term of the Existing Contracts."  ECF No. 1 at 7.  "If a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim."  *S.E.C. v. Lee*, 720 F. Supp. 2d 305, 332 (S.D.N.Y. 2010).  Here, Plaintiff has adequately shown that Schedule 5.1 and the relevant Amendments to the MSA are ambiguous as to whether they may have encompassed the "BOA Claims" contract as an Existing Contract.  Accordingly, Count VIII may proceed.

---

[4] The "BOA Claims" contract extension is implicit because Defendant transferred the BOA Claims work from Plaintiff to a different facility in April 2019, three years after March 2016, the purported expiration date of the BOA Claims contract.  ECF No. 1 at 19.

II.     **Implied Covenant of Good Faith and Fair Dealing (Counts VII and IX)**

    **A.  PCRs 17 and 18 (Count VII)**

Plaintiff alleges in Count VII that "the nature and history of the relationship between DMM and Conduent," together with PCRs 17 and 18, implied that "Conduent would cooperate with DMM to maintain a certain level of work and revenue at the North Wales Facility[,]" and that Conduent breached its duty of good faith and dealing by representing that it would provide DMM with sufficient revenue to maintain financial viability at the North Wales Facility.  ECF No. 1 at 27.  Defendant argues that it made no such representation or promise, directly or implicitly, and therefore did not assume a duty that could have plausibly been breached.  In addition, Defendant argues that Plaintiff's good faith and fair dealing claim as to PCRs 17 and 18 should be dismissed as duplicative of Plaintiff's breach of contract claims.  ECF No. 18-1 at 16. For the reasons below, the Court rejects both arguments.  Count VII may proceed.

In New York, every contract contains an implied covenant of good faith and fair dealing. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).  This implied covenant "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (quoting *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)).  A plaintiff alleges a claim for breach of implied covenant of good faith and fair dealing if it can "'establish[ ] a legal duty separate and apart from contractual duties.'" *Schonfeld v. Wells Fargo Bank, N.A., as Trustee for Aegis Asset Back Secs. Trust Mortgage Pass-Through Certs.*, No. 1:15-cv-01425, 2017 WL 4326057, at *5 (N.D.N.Y. Sept. 27, 2017) (quoting *Washington v. Kellwood Co.*, No. 05 Civ. 10034, 2009 WL 855652, at *6 (S.D.N.Y. Mar. 24, 2009).

A breach of this implied covenant constitutes "a breach of the underlying contract." *Nat'l Mkt. Share*, 392 F.3d at 525.  Therefore, a claim for a breach of the covenant of good faith and fair dealing survives a motion to dismiss "only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract."  *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022); *see also Iskalo Elec. Tower LLC v. Stantec Consulting Servs., Inc.*, 174 A.D.3d 1420, 1424 (4th Dep't 2019) (stating that "[a] cause of action to recover damages for breach of the implied covenant of good faith and fair dealing cannot be maintained where the alleged breach is 'intrinsically tied to the damages allegedly resulting from a breach of the contract'").  But when a complaint alleges "both a breach of contract and a breach of the implied covenant of good faith and fair dealing based on the same facts, the latter claim should be dismissed as redundant."  *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).

Here, Plaintiff's complaint plausibly alleges that the parties' course of dealing may have established a duty on the part of Defendant to maintain a certain level of work and revenue at the North Wales Facility, and to provide Plaintiff with sufficient revenue to maintain financial viability at the facility, in a manner that may have been reflected in, but not fully encapsulated by, Defendant's contractual duties under PCRs 17 and 18.  ECF No. 1 at 27.  Plaintiff alleges that "[t]hroughout the course of the parties' dealings […] the parties' practice and established course of dealing was that, once a particular subcontract was assigned the North Wales Facility and DMM, that subcontract would stay with North Wales Facility and DMM."  ECF No. 1 at 8.  Plaintiff alleges that it depended on a particular level of revenue to maintain the financial viability of the operating the facility, which Defendant understood.  *Id*.  Accordingly, after several subcontracts not at issue in the present action were not renewed, Plaintiff's ability to

maintain the facility was jeopardized.  *Id.*  Plaintiff "repeatedly informed Conduent that DMM needed additional work and revenue" to continue operating the facility and "Conduent agreed" to provide DMM with additional work to maintain and continue the requisite revenue stream.  *Id.* at 10-11.  Toward that end, the parties executed PCR 17 and later PCR 18.  Throughout the negotiation of PCR 17, "both Conduent and DMM repeatedly and expressly linked the HROS HCA Work to the North Wales Sublease and to DMM remaining in the North Wales Facility overall."  *Id.* at 11.  Prior to and during the negotiation of PCR 18, Visconti stated that she would "find a way to provide DMM with the needed additional revenue" and enable Plaintiff to remain in the facility.  *Id.* at 17-19.  While Plaintiff alleges that neither PCR 17 nor 18, alone, expressly obligated Defendant to provide Plaintiff with the revenue necessary for Plaintiff to maintain financial viability in its operation of the facility, Plaintiff has presented plausible allegations that such agreements were part of a broader course of dealing that may have established such an obligation.

Likewise, Plaintiff's good faith and fair dealing claim survives dismissal on duplicative grounds because the factual basis and relief sought for the claim, while similar, are not the same as for the breach of contract claim brought in connection with PCR 17.  *See JN Contemp. Art*, 29 F.4th at 128.  Even if Defendant breached PCR 17 as alleged, by failing to purchase "all" the HCA work as required and transferring the HCA work to the Lynnfield Facility, Plaintiff has plausibly alleged that Defendant may have breached a duty of good faith and dealing that was reflected in, but not fully encapsulated by, PCRs 17 and 18.  In addition, even if the factual basis did not differ, the relief sought for each claim does.  Plaintiff seeks compensatory damages in the amount of $500,000 for the breach of contract claim arising out of PCR 17, ECF No. 1 at 20, and compensatory damages in the amount of $1,000,000 for its good faith and fair dealing claim.

ECF No. 1 at 27.  Accordingly, the Court concludes that the claims are not duplicative.  *See 1555 Jefferson Rd. LLC v. Travelers Prop. Cas. Co. of Am.*, No. 23-CV-6347-FPG, 2023 WL 6927205, at *3 (W.D.N.Y. Oct. 19, 2023) (dismissing claims on duplicative grounds where same damages for each claim sought).  Thus, Count VII may proceed.

### B.  BOA Claims (Count IX)

Plaintiff asserts in Count IX that Defendant breached an implied covenant of good faith and fair dealing with respect to the BOA Claims contract.  ECF No. 1 at 29.  Specifically, Plaintiff asserts that "the entire history of the relationship between DMM and [Conduent] implied that Conduent would not encourage or suggest that customers transfer work away from the North Wales Facility, except at the customer's volitional request."  *Id*.  Plaintiff asserts that Defendant breached its duty to Plaintiff by either (i) unilaterally transferring the BOA Claims work to the Lynnfield Facility, or (ii) encouraging BOA to seek relocation of the work.  *Id*. at 30.  Defendant repeats its contention that BOA Claims was not an Existing Contract and argues, in the alternative, that this claim is duplicative of the breach of contract claim asserted in Count VIII.  Because the Court has concluded that Plaintiff has plausibly alleged that the BOA Claims contract may have been an Existing Contract, the Court addresses only Defendant's duplicative challenge.

As discussed, Plaintiff alleges in the Count VIII breach of contract claim that Defendant breached the Third and Fifth Amendments to the MSA because it transferred the BOA Claims work to the Lynnfield Facility, and further alleged in its complaint that Defendant did so "unilaterally" to increase its profit margins.  ECF No. 1 at 19.  Specifically, Plaintiff alleged that Defendant did not (i) use reasonable commercial efforts to extend the term of the BOA Claims contract, nor (ii) provide DMM with written notice of any transfer request from BOA.  *Id*. at 28-

29.  By contrast, Count IX alleges that Defendant actively encouraged BOA to transfer the work and/or unilaterally relocated the BOA Claims work.  *Id*. at 29-30.  This is conduct that did not breach Defendant's express duties under the Third and Fifth Amendments, which included the twin duties articulated above, and is therefore not subject to a breach of contract claim.  Plaintiff has presented plausible factual allegations that differ from those that underlie the Count VIII breach of contract claim, and that may amount to a breach of a duty of good faith and fair dealing.  Because Count IX is not duplicative of Count VIII, Count IX may proceed.

**III.    Unjust Enrichment (Counts II and X)**

**A.  PCR 17 (Count II)**

Plaintiff asserts in Count II that Defendant substantially benefited by receiving greater profit from transferring the HCA work—contemplated in PCR 17—than it would have received if it remained with Plaintiff at the North Wales Facility, and that Defendant's enrichment was at Plaintiff's expense because Plaintiff no longer received income from the HCA work after the transfer.  ECF No. 1 at 21.  Defendant argues that Plaintiff cannot show Defendant was enriched at Plaintiff's expense.  ECF No. 18-1 at 18.  For the reasons below, Count II may proceed.

To state a claim for unjust enrichment under New York law, a plaintiff must plead facts showing that "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (citations and internal quotation marks omitted).

An unjust enrichment claim is not available to duplicate or replace a contract claim. *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). Under New York law, the existence of a valid and enforceable written contract will ultimately preclude recovery under an unjust

enrichment theory. *Clark-Fitzpatrick, Inc. v. Long Is. R.R.*, 70 N.Y.2d 382, 389 (1987); *see Nieves v. Just Energy N.Y. Corp.*, No. 17CV561, 2020 WL 6803056, at *7 (W.D.N.Y. Nov. 19, 2020).

A breach of contract and unjust enrichment claim may be pled in the alternative, *see* Fed. R. Civ. P. 8(d)(2); *GlaxoSmithKline LLC v. Beede*, No. 13CV1, 2014 WL 896724, at *7 (N.D.N.Y. Mar. 6, 2014), until a contract is found. *See Kapsis v. Am. Home Mort. Servicing Inc.*, 923 F. Supp. 2d 430, 454 (E.D.N.Y. 2013). Alternative pleading is permitted where the parties dispute the existence of a contract or that the contract applies to the subject matter of the lawsuit. *See, e.g., ExamWorks, Inc. v. Soltys*, No. 17CV80, 2017 WL 4712206, at *5 (W.D.N.Y. Aug. 10, 2017)

At this early stage of litigation, Plaintiff has adequately alleged that Defendant was enriched at Plaintiff's expense. In its complaint, Plaintiff alleges that its "takeover" and continued operation of the North Wales Facility was a significant financial undertaking that required consistent revenue and benefited Defendant in that Defendant would not incur expenses for transitioning the work performed at the facility elsewhere. ECF No. 22 at 21. Plaintiff has adequately alleged that Plaintiff provided a benefit to Defendant by remaining in the facility, a decision that was made in part due to the execution of PCR 17. *Id.* Moreover, Count II survives dismissal on duplicative grounds because, as discussed, the parties dispute whether PCR 17 "applies to the subject matter" of this lawsuit. *ExamWorks, Inc.*, 2017 WL 4712206 at *5. As discussed in Section I.A., *supra*, Defendant disputes that PCR 17 prohibited the challenged conduct. Because a breach of contract and unjust enrichment claim may be pled in the alternative under such circumstances, Count II may proceed, even if Plaintiff may not ultimately recover for both claims.

### B. BOA Claims (Count X)

Count X resembles Count II.  Plaintiff asserts in Count X that Defendant substantially benefited by receiving greater profit from transferring the BOA Claims work than it would have received if it remained with Plaintiff at the North Wales Facility, and that Defendant's enrichment was at Plaintiff's expense because Plaintiff no longer received income from the BOA Claims work after the transfer.  ECF No. 1 at 30.  As discussed, Plaintiff alleges that Defendant either unilaterally relocated the BOA Claims contract or encouraged BOA to seek relocation of it.  *Id*.  Defendant argues that Plaintiff cannot show Defendant was enriched at Plaintiff's expense.  ECF No. 18-1 at 19.  Again, at this early stage, Plaintiff has adequately alleged its unjust enrichment claim.  Plaintiff has alleged that Defendant received greater income from the BOA Claims work when it was performed at the Defendant-operated Lynnfield Facility, and that Plaintiff incurred expense by continuing to operate the North Wales Facility absent the BOA Claims work.  ECF No. 22 at 22.  In addition, because Defendant disputes whether the BOA Claims contract was an Existing Contract covered by the Third and Fifth Amendments to the MSA, Plaintiff's BOA Claims breach of contract and unjust enrichment claims may be pled in the alternative, and thus survive dismissal on duplicative grounds.  *See ExamWorks, Inc.*, 2017 WL 4712206 at *5.  Count X may proceed.

## IV. Fraudulent Inducement (Counts III, IV, and VI)

Fraudulent inducement "under New York law requires a showing that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."  *Baker-Rhett v. Aspiro AB*, 324 F. Supp. 3d 407, 418-19 (S.D.N.Y. 2018) (internal quotation marks omitted).  With respect to intent, the plaintiff must demonstrate

that the defendant made a knowing or reckless misrepresentation and intended to defraud the plaintiff thereby. *Horn v. Med. Marijuana, Inc.*, 383 F. Supp. 3d 114, 129 (W.D.N.Y. 2019); *Turner v. Temptu Inc.*, No. 11 Civ. 4144, 2013 WL 4083234, at *11 (S.D.N.Y. Aug. 13, 2013). Fraudulent misrepresentations can consist of either "promises to do something in the future, or misstatements of present fact." *Frontier-Kemper Constructors, Inc. v. Am. Rock Salt Co.*, 224 F. Supp. 2d 520, 528 (W.D.N.Y. 2002). "With regard to misstatements of present fact, the New York courts and the courts in this Circuit generally agree that actions for fraudulent inducement are not barred[.]" *Frontier-Kemper Constructors, Inc.*, 224 F. Supp. 2d at 528.

Plaintiff must plead "with particularity the circumstances" that constitute the basis for its fraudulent inducement claims. Fed. R. Civ. P. 9(b). Accepting Plaintiff's well-plead allegations as true, *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017), Plaintiff's claims must satisfy a four-part test. *See United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127-28 (2d Cir. 1994). First, the complaint must "specify the statements that the plaintiff contends were fraudulent[.]" *Chorches*, 865 F.3d at 81. Second, Plaintiffs must "identify the speaker[.]" *Id.* Third, Plaintiff must "state where and when the statements were made[.]" *Id.* And fourth, Plaintiff must "explain why the statements were fraudulent." *Id*; *see Capax Discovery, Inc. v. AEP RSD Invs., LLC*, 285 F. Supp. 3d 579, 586 (W.D.N.Y. 2018).

"[A]llegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990). Where this "relaxed" standard is invoked, however, the "complaint must adduce specific facts supporting a strong inference" of fraud. *Id.* Relatedly, where a party alleges nondisclosure or a material omission in connection with its claim of a material misrepresentation, a duty to

disclose arises "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *In re Virginia True Corp.*, 654 F. Supp. 3d 216, 221 (E.D.N.Y. 2023) (citing *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993) ("[O]nce a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth[.]")).

With respect to damages, "New York measures damages in fraud cases based on the out-of-pocket loss suffered by plaintiff, but does not include lost profits." *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 736 (S.D.N.Y. 1997); *Busrel Inc. v. Dotton*, No. 1:20-CV-1767, 2021 WL 2980494, at *15 (W.D.N.Y. July 15, 2021); *see also In re Eugenia VI Venture Holdings, Ltd. Litig.*, 649 F. Supp. 2d 105, 121 (S.D.N.Y. 2008), *aff'd sub nom. Eugenia VI Venture Holdings, Ltd. v. Glaser*, 370 F. App'x 197 (2d Cir. 2010) (summary order) (holding that a plaintiff failed to state a claim for fraud because it failed to allege pecuniary loss and "[u]nder the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud" (internal quotation marks omitted)).

## A. PCR 17 (Count III)

Plaintiff asserts in Count III that Defendant made material misrepresentations during the parties' negotiation of PCR 17, on or about March 30, 2020, that were intended to induce Plaintiff to continue to lease and operate the North Wales Facility and extend the Sublease.  ECF No. 1 at 22.  Plaintiff avers that it relied on such representations and suffered damages in the form of additional rent, maintenance, and overhead expenses that it would not have otherwise incurred.  *Id.* at 23.  Defendant argues that Plaintiff fails to allege a material misrepresentation, duty to disclose, a "present fact," and out-of-pocket damages.  ECF No. 18-1 at 12.  For the reasons below, Count III may proceed.

In its complaint, Plaintiff alleges that Kenneth Satsky, a member of Conduent management, emailed Plaintiff on March 30, 2020 "with revenue calculations using DMM's standard rate card pricing and volumes based Conduent's history of performing the HROS HCA Work at the Lynnfield Facility." ECF No. 1 at 21. During multiple conversations around that date, Plaintiff alleges that "Visconti intentionally did not tell DMM that [DMM's] standard pricing would be too high for HCA's requirements" as a third-party client of Defendant. *Id*. at 22. When Visconti made such omissions, Plaintiff alleges, Visconti knew that DMM's pricing was too high, and that HCA was likely to request that the HCA work be transferred away from the North Wales Facility and DMM. *Id*. In addition, it is alleged that Visconti knew that HCA's willingness to pay DMM's prices would be material to DMM's execution of PCR 17 because DMM "would not risk committing to remaining in the North Wales Facility without the commitment of additional revenue" from the HCA work. *Id*.

First, Plaintiff's complaint plausibly alleges that Defendant made a "material false representation" with respect to its alleged knowledge of HCA's acceptable rates because the representation was crucial to Plaintiff's decision to execute PCR 17.[5] *Baker-Rhett*, 324 F. Supp. 3d at 418-19. Still, because this alleged representation involves an omission or nondisclosure, Plaintiff must show Defendant had a duty to disclose the acceptable rates. As discussed, a duty to disclose arises "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *In re Virginia True Corp.*, 654 F. Supp. 3d 216, 221 (E.D.N.Y. 2023).

Accepted as true, Plaintiff's allegation that Defendant knew, but did not disclose, that Plaintiff's pricing would be too high for HCA's requirements, together with the allegation that Defendant knew that HCA's willingness to continue to pay Plaintiff would affect Plaintiff's

---

[5] The remaining three elements are not disputed.

decision whether to enter into PCR 17 and continue to operate the North Wales Facility, suffices to give rise to a duty to disclose.  A disclosure duty exists "when it becomes apparent to the non-disclosing party that another party is operating under a mistaken perception of a material fact." *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1484 (2d Cir. 1995). Here, Plaintiff's complaint plausibly alleges that it may have been apparent to Defendant that Plaintiff would not have agreed to continue its lease and operation of the North Wales Facility if it had known that particular rates may not have been acceptable to HCA at the time it executed PCR 17.  As discussed at length, Plaintiff alleges that its continued operation of the North Wales Facility was a significant financial undertaking that required consistent revenue and that the decision to remain at the facility was made, at least in part, due to the parties' execution of PCR 17.  If, as alleged, Defendant knew that PCR 17 was executed to address declining revenue at the North Wales Facility and such a decline jeopardized Plaintiff's ability to continue operating the facility for the duration of the lease, Defendant may have assumed a duty to disclose the willingness of a key client to remain at the facility.  ECF No. 1 at 9-10.

Even if Defendant had a duty to disclose, Defendant maintains that Plaintiff's claim fails to allege a "misstatement[] of present fact."  *Frontier-Kemper Constructors, Inc.*, 224 F. Supp. 2d at 528.  Defendant argues that Plaintiff's performance of the HCA for approximately fourteen months after the execution of PCR 17—from May 2020 until July 2021—demonstrates that Defendant's alleged expectation that the HCA work would end was not a present fact.  ECF No. 18-1 at 23.  However, that Plaintiff's work for HCA continued for this duration does necessarily refute Plaintiff's contention that HCA may have been unwilling to pay Plaintiff's standard rates for the full term of PCR 17; that is, until March 2022.  ECF No. 1-3 at 3.  Moreover, a small, but not insignificant portion, of that period of work was performed at a reduced rate, as explained in

Section IV.B., *infra*, because Plaintiff reduced its rates in May 2021.   ECF No. 1 at 13.
Accordingly, the Court rejects this argument.

Defendant next contends that Plaintiff cannot demonstrate that it suffered out-of-pocket
damages or pecuniary loss that would have been realized in the absence of fraud.   *See Eugenia
VI Venture Holdings, Ltd. v. Glaser*, 370 F. App'x 197 (2d Cir. 2010) (summary order).   As
discussed, Plaintiff alleges damages in the form of "additional rent, maintenance, and overhead
expenses that it would not have otherwise incurred" but for its entry into PCR 17.   Accepting as
true Plaintiff's allegation that it may not have remained in the North Wales Facility and incurred
the attendant costs of doing so if Defendant had disclosed HCA's alleged unwillingness to pay
Plaintiff's rates, the Court concludes that Plaintiff has adequately alleged out-of-pocket damages
at this stage.

### B.  PCR 17 Rate Reduction (Count IV)

Plaintiff alleges in Count IV that Defendant materially misrepresented that HCA had
directly requested a cost reduction of the rates Plaintiff charged HCA at the North Wales
Facility.   ECF No. 1 at 23.   Specifically, Plaintiff contends that, on or about April 7, 2021, after
the execution of PCR 17, Visconti emailed Plaintiff, purportedly on behalf of HCA, to request
that Plaintiff lower its rates for the HCA work by $30,000 per quarter.   *Id*.   Based on this
representation, Plaintiff agreed to reduce its rates beginning in May 2021.   *Id*. at 13.   In July
2021, the HCA work was transferred from the North Wales Facility to the Lynnfield Facility.   *Id*.

Defendant first argues that Count IV should be dismissed for failure to properly allege
damages.   Defendant argues that no out-of-pocket loss is alleged because Plaintiff does not claim
it "gave anything up of value in reliance on a misrepresentation[,]" but rather claims "lost profits
from the HCA work because it reduced its rate."   ECF No. 18-1 at 24.   To the contrary, however,

Plaintiff does not claim "lost profits" damages, but merely the "pecuniary loss" of the rate reduction as compared to the standard rate during the period at issue.  The Court need not engage with the pricing scheme contemplated by PCR 17, nor calculate a $30,000 quarterly rate reduction as applied to the volume of HCA work Plaintiff performed during the approximately three-month period the HCA work remained at the North Wales Facility, to conclude that Plaintiff has adequately alleged "out-of-pocket" damages.  Such damages will "consist solely of the actual pecuniary loss directly caused by the fraudulent inducement … the difference between the value of the received consideration and the delivered consideration constitutes 'out of pocket' damages." *Power Auth. of New York ex rel. Solar Liberty Energy Sys., Inc. v. Advanced Energy Indus., Inc.*, No. 1:19-CV-1542-LJV-JJM, 2023 WL 2756968, at *4 (W.D.N.Y. Feb. 1, 2023) (quoting *Kumiva Group, LLC v. Garda USA Inc*., 146 A.D.3d 504, 506 (1st Dep't 2017)).  Here, the value of the received consideration is plausibly alleged to be the revenue Plaintiff received from the HCA work it performed at the reduced rate and the delivered consideration is alleged to be the value of the HCA work Plaintiff performed.  Accordingly, Plaintiff has properly alleged damages in connection with this claim at this stage.

Next, Defendant contends that Plaintiff fails to plead the alleged fraudulent statements with particularity.  Defendant argues that Plaintiff has merely alleged, without more, that Visconti "represented" HCA's requested rate reduction.  ECF No. 18-1 at 23.

As discussed, Plaintiff's complaint must "specify the statements that the plaintiff contends were fraudulent[.]" *Chorches*, 865 F.3d at 81.  Plaintiff must then "identify the speaker," "state where and when the statements were made," and "explain why the statements were fraudulent." *Id*.  Defendant only disputes the specification of the statements.

Here, Plaintiff's complaint alleges that "[o]n or about April 7, 2021, Ms. Visconti emailed DMM and requested that DMM lower its rates for the HCA Work by $30,000 per quarter" and that Visconti "represented to DMM that the rate reduction had been requested by HCA." ECF No. 1 at 23. While Plaintiff's allegations are limited, they sufficiently "specify the statements that the plaintiff contends were fraudulent," *Chorches*, 865 F.3d at 81, and "'provide [Defendant] with fair notice of [Plaintiff's] claim, [sufficient] to safeguard [Defendant's] reputation from improvident charges of wrongdoing" in a manner consistent with Fed. R. Civ. P. 9. *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016); *see also Capax Discovery, Inc.*, 285 F. Supp. 3d at 589. Accordingly, Count IV survives dismissal on this basis.

### C. PCR 18 (Count VI)

Plaintiff asserts in Count VI that Defendant made material misrepresentations by omission regarding the duration of the Life Celebrations and BOA Lockbox contracts during the parties' negotiation of PCR 18. ECF No. 1 at 25. Specifically, Plaintiff alleges that Defendant had a duty to disclose its alleged knowledge that the Life Celebrations and BOA Lockbox contracts that were the subject of PCR 18 were likely to end and deprive Plaintiff of the revenue it required to continue its operation of the North Wales Facility. *Id*. Defendant asserts that no duty to disclose existed and that Plaintiff fails to allege a present fact with respect to the contracts.

Executed in December 2020, PCR 18 provided, in pertinent part, that Defendant agreed to a "$20,000 monthly payment associated to the processing of Bank of America lockbox production [...] commencing January, 2021" and a "$15,000 monthly payment associated to the service for the Xerox/Life Celebration account commencing March, 2021." ECF No. 1-4 at 2. PCR 18 provided that these monthly payments, totaling $35,000 per month, were to be effective

through March 2022.  *Id*. at 3.  Plaintiff alleges that from September 2020 through December 2020, the period in which the parties negotiated and ultimately executed PCR 18, Defendant "knew that Xerox and Life Celebrations were in litigation and were negotiating a settlement whereby Life Celebrations would purchase two brand-new IGEN-5 printers from Xerox."  ECF No. 1 at 15.  Plaintiff alleges that Defendant extended the North Wales Sublease, which existed to allow Defendant to service Life Celebrations at the North Wales Facility, because Defendant wished to "facilitate the negotiations between Xerox and Life Celebrations and the settlement of the litigation."  Id. at 14-15.  Plaintiff alleges that Defendant knew that "if the Xerox/Life Celebrations settlement went through, Life Celebrations would terminate its contract with Conduent," which would result in Conduent's termination of the Life Celebrations subcontract with Plaintiff.  Id. at 15

Similarly, Plaintiff alleges that Defendant "knew that BOA" would terminate the BOA Lockbox contract, as it did in July 2021, because such transitions in the parties' industry typically take at least six months to accomplish and are preceded by at least nine months to a year's notice to the existing provider; in this case, Conduent.  *Id*. at 16.  Plaintiff therefore alleges that, at the time the parties were negotiating PCR 18, Defendant "knew or reasonably anticipated that BOA was about to terminate the BOA Lockbox work."  *Id*.  During the negotiation of PCR 18, Plaintiff alleges that Defendant insisted that the monthly payments be directly linked with the Life Celebrations and BOA Lockbox contracts.  *Id*.

In May 2021, Defendant notified Plaintiff that the BOA Lockbox contract was to be terminated effective July 28, 2021, and in July 2021, that the Life Celebrations contract was to be terminated effective July 31, 2021.  *Id*. at 17.  Plaintiff alleges that it would not have remained

at the North Wales Facility if it had known that Defendant expected the BOA Lockbox and Life Celebrations contracts to terminate prior to March 2022, the express duration of PCR 18.  *Id.*

Accepted as true, Plaintiff's allegations that Defendant knew, but did not disclose, that the BOA Lockbox and Life Celebrations contracts were likely to end, and that such knowledge would be material to Plaintiff's decision whether to enter into PCR 18 and continue to operate the North Wales Facility, suffices to give rise to a duty to disclose.  As discussed, such a duty exists "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge."  *In re Virginia True Corp.*, 654 F. Supp. 3d 216, 221 (E.D.N.Y. 2023).  Plaintiff's complaint plausibly alleges that Defendant possessed knowledge of each contract's likely end and that Defendant knew Plaintiff would not have agreed to continue its lease and operation of the North Wales Facility if it had known that the monthly payments agreed to in PCR 18 would end prior to March 2022.  If, as alleged, Defendant knew PCR 18 was executed to address declining revenue at the North Wales Facility, and such a decline jeopardized Plaintiff's ability to continue operating the facility, Defendant may have assumed a duty to disclose each contract's expected duration.  ECF No. 1 at 14-19.  Thus, Count VI survives dismissal on this basis.

Still, Defendant maintains that Plaintiff's claim fails to allege a "misstatement[] of present fact."  *Frontier-Kemper Constructors, Inc.*, 224 F. Supp. 2d at 528.  As it contended with respect to Count III, Defendant suggests that Plaintiff's performance of the BOA Lockbox and Life Celebrations work until July 2021 demonstrates that Defendant's alleged expectation that each contract would end before the term of PCR 18 elapsed was not a present fact.  ECF No. 18-1 at 27.  As the Court determined with respect to Count III, that Plaintiff's work continued from December 2020 until July 2021 does not undermine Plaintiff's contention that Defendant may

have known at the time of the execution of PCR 18 that the BOA Lockbox and Life Celebrations

work would not remain with Plaintiff until the term of PCR 18 ended in March 2022.  ECF No.

22 at 30.  Accordingly, Count VI may proceed.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is denied.  Defendant shall

answer Plaintiff's complaint within thirty days of the entry of this Order.

IT IS SO ORDERED.

Dated: December 12, 2023
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York